# Richmond

BRUCE RIDDICK v. COMMONWEALTH OF VIRGINIA.

March 3, 1947.

Record No. 3184.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*R. R. Pontifex* and *W. H. Starkey,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Bruce Riddick was indicted for the murder of LeRoy Carr. Upon arraignment he pleaded not guilty and at the trial admitted the shooting, but claimed that it was in self-defense. A jury found the accused guilty of murder in the second degree, fixed his punishment at confinement in the State penitentiary for fifteen years, and the trial court entered judgment on the verdict.

The sole contention made before us is that the trial court committed prejudicial error in excluding from the jury evidence that shortly before the shooting Carr uttered threats against the accused and expressed the intention of killing him. This evidence was excluded on the ground that the threats had never been communicated to the accused.

The principals in this tragedy are members of the colored race. About six months before the shooting, Virginia Peterson, with whom Carr had been keeping company for some time, transferred her affections to Riddick. Angered by this, Carr cursed and abused the girl, and on one occasion shot at her with a pistol. On her complaint Carr was placed under a peace bond.

The accused knew of these occurrences. Because of them, and because of the fact that he had heard that Carr carried a pistol and had made threats against his (the accused's) life, the accused armed himself with a pistol.

On the night of April 15, 1946, the accused met Virginia Peterson at the end of her day's work at the Navy Y. M. C. A., in the city of Norfolk. As the girl came out of the building to keep her appointment with Riddick, Carr came across the street and said to her: "You are going with me tonight." With this Carr caught hold of her, tore her clothes, and broke her glasses. He then pulled or shoved the girl along the street in a disorderly manner for a distance of several blocks. All the while Riddick, who accompanied them, remonstrated with Carr, telling him that unless he desisted from such disorderly conduct the police would

probably be attracted thereby and would take the three of them into custody.

When they had reached a point on Brewer street, some seven blocks from the place where the fracas had been started, the girl, by slipping out of her coat, escaped from Carr's grasp and ran from the scene. As she did so she saw Riddick fire a single shot at Carr.

Riddick testified that just prior to the shooting Carr advanced upon him with a knife, and that he (Riddick), apprehending that his own life was in danger, shot Carr when the latter was about six feet away.

According to Riddick's further testimony, Carr, who was a powerful man, weighing more than two hundred pounds, although mortally stricken, caught Riddick, a man of slight build, disarmed him, and threw him over his shoulder into the street. Carr, badly wounded, stumbled a short distance away, while Riddick escaped in the opposite direction.

Shortly thereafter the police arrived upon the scene and found Carr in a dying condition. In his hand he held Riddick's pistol. At the scene of the accident were found the knife with which Riddick said he had been attacked by Carr, and the girl's torn pocketbook.

The girl testified that just prior to the shooting she did not see Carr advancing upon the accused, nor did she see any knife in Carr's hand. On cross-examination she admitted, however, that she was badly frightened by the whole affair and was mainly bent upon making her escape from the scene.

Bud Riddick, a cousin of the accused, testified that several days prior to the shooting Carr came to his (Bud Riddick's) house, uttered threats against the accused, saying that he was going to "kill the son-of-a-bitch." Bud Riddick told the accused of this incident.

The defense then offered to prove by John Johnson, who lived at the same address where the accused resided, that about two hours before the shooting Carr came to the accused's residence and inquired as to the latter's whereabouts. Upon being told where the accused was, Carr became

violent, banged on the door, saying that he was going to find the accused and "kill the son-of-a-bitch."

As has been said, this latter evidence was excluded upon the ground that these particular threats had never been communicated to the accused.

Counsel for the accused contend before us, as they did in the lower court, that the evidence was admissible, not to justify the homicide, but in order to show the evil disposition of the deceased toward the accused and that the deceased was the aggressor, and also to corroborate Bud Riddick's testimony of other threats which Carr had made against the accused and about which the accused had been told.

We are of opinion that the lower court erred in excluding this evidence.

Wigmore on Evidence, 3d Ed., Vol. 1, sec. 110, p. 546, says this on the subject: "Where on a charge of homicide the excuse is self-defence, and the controversy is whether the deceased was the aggressor, the deceased's threats against the accused are relevant. The deceased's design to do violence upon the defendant is of some value to show that on the occasion in question he did carry out, or attempt to carry out, his design. Moreover, it is the fact of his design, irrespective of its communication to the defendant, that is evidential."

Continuing, in section 111, page 547, the author says: "This evidence is now conceded to be admissible, by virtually all Courts."

The text is supported by numerous cases from various jurisdictions throughout the country.

In 26 Am. Jur., Homicide, sec. 364, pp. 408, 409, the same view is taken. As this authority says, where self-defense is in issue, evidence of uncommunicated threats is admissible as showing "the disposition of the deceased toward the accused," and the fact that the deceased "was the aggressor" in the controversy. "Also, such threats are held to be admissible when corroborative of communicated threats."

See also, 1 Greenleaf on Evidence, 16th Ed., sec. 14 K, p. 55; 40 C. J. S., Homicide, sec. 276 (d), p. 1237.

Among the recent cases approving the principles thus laid down are *Commonwealth* v. *Rubin*, 318 Mass. 587, 63 N. E. (2d) 344, 345-6; *People* v. *Wright*, 294 Mich. 20, 292 N. W. 539, 541.

While the precise question has not been previously presented to our court,* it has been before the highest court of West Virginia in a number of cases. See *State* v. *Arrington*, 88 W. Va. 152, 106 S. E. 445, and cases there cited.

In the latter case the syllabus by the court reads thus: "Where on a charge of homicide the excuse is self-defense, and the testimony is conflicting as to the aggressor, there being some to show that it was the deceased, his threats against the accused, though not communicated to the latter, are relevant and admissible to show the deceased's attitude of mind shortly prior to the combat."

We are not unmindful of the fact that in the case before us the jury has rejected the accused's version of the homicide. Whether it should have done so is not now before us. The relevancy of the excluded testimony, however, must be viewed in the light of his story which the jury might have accepted. According to his testimony the deceased was the aggressor. Plainly, the deceased was looking for trouble when he intruded himself upon the accused and the girl. Moreover, according to the further testimony of the accused, at the time of the actual shooting his adversary was advancing on him (the accused) with a knife.

█ The excluded testimony of Johnson was that Carr, only about two hours before the shooting, came· to the accused's residence, swearing vengeance against the accused and expressing the intent to kill him. This evidence was not only corroborative of the threats which Bud Riddick had heard Carr make against the accused, but tended to show Carr's design· to do violence to the accused at the

---

*Compare, *Hardy* v. *Commonwealth*, 110 Va. 910, 918, 67 S. E. 522; *Stapleton* v. *Commonwealth*, 123 Va. 825, 829, 96 S. E. 801.

earliest opportunity,—an opportunity which he promptly sought and quickly found.

For this reason we are of opinion that the verdict must be set aside, the judgment reversed, and the case remanded for a new trial.

*Reversed and remanded.*