# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## HOLMAN B. THOMAS v. COMMONWEALTH OF VIRGINIA.

January 15, 1945.

Record No. 2900.

Present, All the Justices.

The opinion states the case.

J. Byron Hopkins, Jr., R. H. Cooley, Jr., Spottswood W. Robinson, III, and Lynwood E. Smith, for the plaintiff in error.

Abram P. Staples, Attorney General, and V. P. Randolph, Jr., Assistant Attorney General, for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

Holman B. Thomas was tried by a jury upon an indictment which charged him with the murder of A. K. Fleming, a police officer. The jury found him guilty of murder in the first degree and the court sentenced him to be electrocuted. The petition for a writ of error assigns numerous errors.

The action of the court in instructing and communicating with the incomplete panel of jurors and swearing officers to take charge of the panel; and, later, in committing the full panel of jurors to these officers in the absence of the defendant, is assigned as error.

The pertinent facts follow:

On the first day of the trial, when only fourteen of the necessary twenty prospective jurors had been selected, it was necessary to recess until the panel could be completed. The court, in the absence of the accused, but in the presence of his counsel, administered oaths to two police officers who were to take charge of the selected jurors until the completion of the panel, and instructed the prospective jurors not to discuss the case with anyone. Counsel for accused immediately called the attention of the court to the fact that the accused was absent from the court room during these proceedings, whereupon the accused was brought in from the jury room adjoining the court room and the whole proceeding was repeated in his presence. Later in the day, after the trial had begun and in preparation for adjournment, two regular officers were sworn to take charge of the jury overnight. This was done in the absence of the accused but before any separation of the jury. Again the attention of the court was called to the fact of the absence of the accused and the proceeding was immediately repeated in his presence.

While it is the customary and salutary proceeding to administer an oath to the officer in whose charge the jury is placed during the interim of a trial, it has been held by this court that the swearing in of an officer to take charge of the jury is no part of the trial of the case. This was so held in *Bennett* v. *Commonwealth*, 8 Leigh (35 Va.) 745. See also,

*Kennedy* v. *Commonwealth*, 2 Va. Cas. (4 Va.) 510, and *Mendum* v. *Commonwealth*, 6 Rand. (27 Va.) 704.

■ While we repeat that as a matter of precaution the fourteen prospective jurors should have been placed in charge of the sheriff, the method of procedure adopted was without error. As a matter of law it was not necessary to commit them to the care of an officer.

This was held to be the rule in *Martin* v. *Commonwealth*, 2 Leigh (29 Va.) 745. In that case we read:

■ "No case has been cited, and we have found none, in which a separation of the jury, before any evidence has been introduced, has been held to be a sufficient cause to set aside the verdict. Cooke, Foster and Blackstone say that after the jury are sworn and charged with the prisoner, and after evidence has been given, the jury cannot be discharged or separated. In *Burr's* trial, it being impractical to empanel a jury on the first day, four were sworn, and the question being made, whether they should be confined, the court held that it was unnecessary. We are not disposed to increase the rigour which has prevailed upon this subject."

This doctrine was reaffirmed in *Tooel* v. *Commonwealth*, 11 Leigh (38 Va.) 714, the court saying: "The decision of Chief Justice Marshall in *Aaron Burr's Case* 'that there was no necessity for delivering the jurymen, who had been or should be sworn, into the custody of the marshal, until the whole number had been impaneled and sworn,' 1 Burr's trial p. 382, and the opinion of this court in *Martin's Case*, 2 Leigh 745, are decisive authorities against the prisoner's application."

That the rigor of the common law rule has been relaxed and a forward step taken by the Legislature in the administration of the criminal law is evidenced by the amendment to section 4902 of the Code, which was enacted at the 1944 session of the General Assembly. The amendment is as follows:

"In any case of a felony when the punishment cannot be death, the jury shall not be kept together unless the court otherwise directs. In any case of felony when the punish-

ment may be death, the court in its discretion may permit the jury to separate, provided that no objection by either the Commonwealth's attorney or the accused appears of record thereto, but no such objection shall be made by either the Commonwealth's attorney or the accused in the presence of the jury."

The contention that a new trial should be awarded because of the admonition of the judge to the jury during the momentary absence of the accused is precluded by our recent decision in *Rogers* v. *Commonwealth*, *ante*, p. 190, 31 S. E. (2d) 576.

In construing section 4894 of Michie's Code, which provides that: "A person tried for felony shall be personally present during the trial," we laid down this doctrine: "It is thus apparent that the test to be applied in determining whether or not the statute has been violated is: Has the interest of the defendant been affected by the action of the judge?"

As we held there, so we now hold, that it is inconceivable that the precautionary remarks of the judge could have affected in the slightest degree the interest of the accused.

Though counsel for accused have cited us to one hundred and eighty-seven cases from other jurisdictions, in alleged support of their contention, we reiterate the rule stated by Mr. Justice Eggleston in *Powell* v. *Commonwealth*, 182 Va. 327, 28 S. E. (2d) 687, that "where prejudice is shown the accused is assured of a new trial. On the other hand, where no prejudice is shown, the Commonwealth is spared the trouble and delay of a new trial based upon a mere technicality."

There is no merit in the assignment of error.

The next assignment of error calls in question the refusal of the court to give instruction "L" as offered, and in giving it as amended.

Upon motion, nine instructions were given for the Commonwealth and twelve for the accused. Instruction "L" was a combination instruction defining the doctrine of reason-

able doubt and the doctrine of excluding every reasonable hypothesis except that of the guilt of the accused.

An examination of the record discloses that eight instructions were given the jury involving the question of reasonable doubt, and one instruction involving the question of "reasonable hypothesis" of guilt. Had the court refused to give instruction "L" as offered, its action would have been without error, for the reason that the jury were fully instructed on the questions involved. In amending the instruction by deleting the question of "reasonable hypothesis" of guilt, and giving it as amended, the court merely added to the burden of the jury in its consideration of the numerous instructions dealing with every phase of the case which had theretofore been given.

In *Smith* v. *Commonwealth*, 155 Va. 1111, 156 S. E. 577, Mr. Justice Holt said:

"When a court has once, in apt language, told the jury that the burden is upon the Commonwealth to prove the guilt of the accused beyond all reasonable doubt, that is enough. Reiteration of this elementary proposition is neither helpful nor desirable."

There is no merit in this assignment of error.

The next assignment of error calls in question the action of the court in admitting in evidence the statements of Fleming made immediately after being shot by the accused.

It conclusively appears that within two minutes of the shooting and while Fleming was being supported by one Tucker Edmonds, he said to Thelbert Roby, "Thelbert, I am dying. Come here, Thelbert, he (the accused) has shot me." He requested that his wife and daughter be notified.

When Dr. H. B. Showalter, the attending physician, arrived approximately fifteen minutes after the shooting, Fleming said to him, "There is no use taking me anywhere, this will be the last of me—he shot me just as I got out of the car, I never had a chance."

Upon the arrival of Mrs. Fleming, approximately fifteen minutes after the shooting and while still lying on the ground in great pain, Fleming said to her, "This is the end.

He shot me just as I got out of my car. I didn't have a chance."

In our opinion the contention of the Commonwealth is tenable, that the several statements were admissible on two grounds: First, as dying declarations; and, second, on the ground that they were a part of the *res gestae.*

In the recent case of *Waller* v. *Commonwealth*, 178 Va. 294, 16 S. E. (2d) 808, this court dealt at length with the question of the admissibility in evidence of dying declarations. In that case the Virginia rule, as stated in *Hill* v. *Commonwealth*, 2 Gratt. (43 Va.) 594, is restated and approved. The court also quotes with approval the doctrine stated in *Compton* v. *Commonwealth*, 161 Va. 980, 170 S. E. 613. There it is said:

"In his Exposition of the Law of Crime and Punishment, at page 288, Professor John B. Minor thus clearly and concisely states the Virginia rule: 'Dying declarations are admissible only in case of *homicide* when made by the person injured touching the cause of his death, while actually in extremis and *conscious* that *he is so*, under a sense of impending *death*, and without any expectation or hope of recovery.' "

In *Patterson* v. *Commonwealth*, 114 Va. 807, 75 S. E. 737, Judge Keith, in a concurring opinion, said:

"Whether or not a dying declaration is admissible depends largely upon the mental condition of the declarant. If a man who has received a wound believes that wound to be mortal and that he will shortly die of it, his declaration is admissible, and I know of no way in which his mental attitude can be ascertained except by what the declarant may say and do."

On the question of *res gestae* we have seen that within two minutes of receiving his fatal wounds Fleming made the first statement to Thelbert Roby. The subsequent statements were made in approximately fifteen minutes after the shooting.

In *McCann* v. *Commonwealth*, 174 Va. 429, 4 S. E. (2d) 768, the doctrine stated in *Huffman* v. *Commonwealth*, 168

Va. 668, 190 S. E. 265, was reaffirmed. In the latter case Mr. Justice Gregory said:

"Whether a statement is part of the *res gestae* depends on the circumstances of each case, and there is no fixed rule by which it can be decided. Statements of the victim made a short time after he has been mortally wounded which obviously have not been concocted or premeditated charging the defendant with the act are a part of the *res gestae*."

It is well-nigh impossible to conceive of a set of circumstances which so fully exemplify the rules stated above as those shown in the case at bar.

The last assignment of error relates to the action of the court in refusing to set aside the verdict of the jury on the ground that it is contrary to the law and the evidence.

We deem it proper to state that this case was submitted to the court without oral argument. While the refusal of the court to set aside the verdict of the jury is assigned as error, there is nothing in the petition, which is adopted as a brief, to indicate that this assignment is relied upon.

The evidence introduced in the case is very brief. That of the Commonwealth is as follows:

On December 13, 1943, the accused, a married negro man, left his work at Camp Pickett at 3:30 p. m. and went to nearby Blackstone, Virginia, where he bought two bottles of wine. After consuming the wine he had purchased, he went to his home in Kenbridge, Virginia, arriving there about dark. As he was putting his car up he met three other colored people, Coleane Keeton, Richard Keeton and Mary Hargrove. The four of them decided to drink some wine which accused had stored in his wood-house. After drinking the wine they drove around the countryside. On this trip the accused, who was driving the car, on one occasion drove off of the road into a ditch, and thereafter drove the car into a stump. Approximately at midnight they returned to Kenbridge and accused, instead of going to his own home, went to the home of the Keeton woman. Richard Keeton and Mary Hargrove went into one room, while accused and

Coleane Keeton went into her bedroom and got into bed together. Some time thereafter Flora Keeton, the mother of Coleane, returned home, and finding her daughter in bed with the accused, picked up a piece of kindling wood and struck accused over the head. The accused then left the Keeton home and in less than thirty minutes returned thereto. When he arrived at the Keeton home he fired two shots through the kitchen floor and one shot through the window. He then broke the door open and went into the room of Flora Keeton. Pointing his pistol at Flora, he said to her, "Are you going to tell anybody I have been here?" She said, "No, I am not going to tell anybody." Accused then said, "Are you going to tell my wife I have been here?" Flora answered, "No." Accused, with the pistol in his hand, then said, "If you tell the law or go get him, I will kill him, too, the damn son of a bitch. I will kill you, too, and then I will kill myself." When accused backed out of the room Flora jumped out of the window and went to the home of Thelbert Roby and requested him to call "the law," meaning Fleming.

Roby testified that Flora Keeton came to his home at approximately 1:15 a. m. and requested him to call Fleming to come to her house to quell a disturbance created by accused; that she told him accused had threatened to kill her and "the law;" that he did not have a 'phone and directed Flora to go to the Leader Warehouse and call Fleming; that he proceeded to the warehouse where he met Fleming; that he informed Fleming of the threat made against him by accused and advised him to procure help before going to the Keeton house; that Fleming drove off in his car and in about two minutes he heard pistol shots; that he immediately went to the scene of the shooting and found Fleming lying on the ground.

It further appeared in evidence that some time prior to the affray Fleming, acting as a police officer, had procured a warrant against accused, charging him with being drunk, disorderly and with resisting arrest; that accused was tried

upon this warrant and fined $25.00 and sentenced to serve thirty days in jail.

It is beyond dispute that Fleming died as a result of the wounds inflicted by accused.

Accused, testifying in his own behalf, said that Fleming fired the first shot and he shot in self-defense. In contradiction of this statement he also said that he was so addled from the effects of the blow administered by Flora Keeton that he could not recall what had happened.

The jury did not believe the statement of accused, that he was first assaulted, and thus resolved the conflict of evidence in favor of the Commonwealth.

That the evidence adduced by the Commonwealth sustains the verdict of the jury is too plain to warrant lengthy discussion. As we view the record, there is not the semblance of an excuse offered for the cold-blooded murder of a law-enforcing officer while in the discharge of his duty.

We think it is conclusively shown that accused first threatened to kill Fleming and then, no doubt inflamed because Fleming came to arrest him, carried his threat into execution.

There is no error in the judgment of the trial court and it is affirmed.

*Affirmed.*